Ignacio F. LEWIS–MOTA et al.,
Plaintiffs,

v.

The SECRETARY OF LABOR,
Defendant.

No. 71 Civ. 469.

United States District Court,
S. D. New York.

Feb. 8, 1972.

Antonio C. Martinez, New York City, for plaintiffs.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York by Stanley H. Wallenstein, and Joseph P. Marro, Special Asst. U. S. Attys., of Counsel, for defendant.

## OPINION

POLLACK, District Judge.

The plaintiffs, aliens, are visa applicants seeking to enter the United States for the purpose of performing labor. Under the Immigration and Nationality Act, § 212(a) (14), 8 U.S.C. § 1182(a) (14) (the Act), they are ineligible to receive visas and are excluded from admission into the United States unless at the time of application for a visa and admission there are not sufficient qualified workers in the United States willing to perform the work of which the alien is capable and unless the employment of such aliens would not adversely affect wages and working conditions of workers in the United States similarly employed.

The determination and certification of the conditions for eligibility of such aliens for visas to enter the United States is required by the Act to be made by the Secretary of Labor to the Secretary of State and to the Attorney General.

The plaintiffs bring this class suit to obtain a judgment declaring invalid the February 7, 1970 Directive (the "Directive") of the Secretary of Labor which (1) required proof of a job offer in the United States before the Secretary would certify the existence of insufficient domestic labor for occupations in which the plaintiffs seek employment and (2) which phased out after a year the then outstanding precertifications. A judgment is also sought declaring that the labor precertifications previously obtained which have expired under the terms of the Directive should be revalidated as of the date of original issue.

The underlying thesis of the suit is that the Secretary did not comply with the publication requirements of the Administrative Procedure Act, 5 U.S.C. §§ 552 and 553, in effecting the change in procedure and modifying the effect of existing precertifications.

*Background*

Under the authority of § 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14), and to reduce delay in processing an alien's request for visa, the Secretary of Labor by a regulation dated January 25, 1967 made a determination on the state of the domestic labor market in three schedules (A, B and C) setting forth categories of employment.[1] Schedule A and C occupations were found and certified to be in short labor supply. Schedule B described occupations for which no such finding and certification could be made.

Aliens who applied for qualification and established their suitability for occupations described in Schedules A and B were not required to submit a specific job offer from an employer in the United States in order to obtain provisional certification. Schedule C differed however from Schedule A in that Sched-

---

1. 32 F.R. 867 (January 25, 1967). The promulgation of Schedule C was preceded by a Notice of Proposed Rulemaking on December 23, 1966 (31 Fed.Reg. 16466). Each occupation certifiable was listed. This regulation added Schedule C to Schedules A and B which had been established by regulation promulgated after the 1965 amendment to 8 U.S.C. § 1182(a) (14), 30 Fed.Reg. 14979 (December 3, 1965).

ule C described occupations found to be in short labor supply generally, but not nationally, and was to be reviewed continuously to be kept current. The regulation establishing Schedule C, however, made no mention of any period of time during which "certifications" of applicants thereunder would continue to be valid.

On the other hand, aliens whose occupations were not included on any schedule were required to submit proof of a specific job offer in the United States (form ES–575B: Job Offer for Alien Employment)), in support of their application for a labor certification, and were required to submit form ES–575A (Statement of Qualifications of Alien), on which bases the Secretary of Labor's findings as to availability of American workers and adverse effect would then be made.

On January 23, 1969, the Secretary of Labor promulgated a new regulation which established a new Schedule C, Precertification List, and thereby abolished the old Schedule C. 29 C.F.R. 60.3(c) (January 23, 1969); Notice of Proposed Rulemaking, 33 Fed.Reg. 17244 (Nov. 21, 1968). The new Schedule C, Precertification List, set forth occupations and geographic locations for which a "precertification" would be issued. Although the new Schedule C was not published in the Federal Register, the new regulation spelled out the nature of the new list, and it provided specifically that changes and deletions from the list would be made as required by the condition of the labor market.

In keeping with the procedure under the former schedule, an alien whose occupation was on the new Schedule C, Precertification List, was not required to submit proof of a specific job offer in support of his application for labor certification since the Secretary of Labor had already made a determination under § 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14) that domestic workers were unavailable and that the alien's employment would not adversely affect the wages and working conditions of workers in the United States.

The plaintiffs were duly "certified" or precertified under either the old Schedule C or Schedule C, Precertification List, as the case may be (hereafter "certification" and precertification, will be referred to generally as precertifications).

### The Directive

On February 9, 1970, because of changes in the conditions of the domestic labor market, the Secretary of Labor issued a directive suspending the entire Schedule C, Precertification List, and providing that pending precertifications would be valid only for a year from date of the precertification or until June 30, 1970, whichever was later. The Directive made the previous blanket findings of unavailability of domestic workers and of lack of adverse effect no longer automatically applicable to the listed occupations. Advance notice of this suspension was not published in the Federal Register.

The suspension of the Schedule C, Precertification List, as mentioned above, required alien workers seeking admission to submit proof of a job offer in the United States before the Secretary of Labor's finding under § 212(a) (14) of the Act, 8 U.S.C. § 1182(a) (14), would be made. Aliens who had already been precertified under Schedule C, but had not obtained immigration visas, retained their precertification for a year from the date of precertification or June 30, 1970, whichever date occurred later. If they had not obtained a visa by then, revalidation of the labor precertification was required and in order to obtain this, proof of a job offer in the United States was necessary.[2]

2. Each of the individual plaintiffs was precertified under Schedule C before the Directive was issued and this without the necessity of a job offer. The precertification date of plaintiff Lewis-Mota was July 25, 1969; that of plaintiff

Although the Directive suspended the Schedule C, Precertification List, and required applicants to submit proof of a job offer to obtain a certification, the submission of proof of a job offer by the plaintiffs and those in their class would, however, restore their original priority positions in line for a visa. The new requirement for revalidation did not operate to prejudice plaintiffs' position in the line for visa processing.

The rule that outstanding precertifications made pursuant to the Schedule C, Precertification List, would be valid for only one year after the date of certification (or June 30, 1970, if later) and that revalidation would be required after that period was not published until February 4, 1971. 36 Fed.Reg. 2464. By this time, the validity of the precertifications of the plaintiffs had expired under the terms of the Directive.[3]

However, before that publication, each of the plaintiffs had received a communication from their respective consulates announcing the expiration at that time of his or her precertification and indicating the procedure for revalidation.

Plaintiffs contend that because the Directive had a substantial impact on the status conferred by their precertifications, the "rule" which it announces is a "substantive rule" and obliges the Secretary to follow the rulemaking procedures in 5 U.S.C. § 553, especially subsections (b) and (d) relating to publication, and the publication requirement in 5 U.S.C. § 552(a) (1).

Section 553 of Title 5 provides in pertinent part:

> (b) *General notice of proposed rule making shall be published in the Federal Register* . . . .
>
> . . . .
>
> Except when notice or hearing is required by statute, this subsection does not apply—
>
> (A) to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice . . . .
>
> . . . .
>
> (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
>
> (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
>
> (2) interpretive rules and statements or policy; or
>
> (3) as otherwise provided by the agency for good cause found and published with the rule . . . ..

Whether publication is mandated has been tested by some courts from the viewpoint of the impact of the questioned action, Pharmaceutical Manufacturers Ass'n v. Finch, 307 F.Supp. 858 (D.Del.1970); National Motor Freight,

---

Gomez was March 14, 1969; and that of plaintiff Liz-Marte was January 14, 1969.

Under the terms of the Directive, the expiration date of Lewis-Mota's precertification was July 25, 1970; that of plaintiff Gomez June 30, 1970; and that of plaintiff Liz-Marte June 30, 1970; none of the plaintiffs submitted proof of a job offer either before or after their respective expiration dates.

Certification under Schedule C or Schedule C, Precertification List, operated to establish an immigrant visa priority date for applications approved thereunder. In the Western Hemisphere on February 7, 1970, only persons with priority dates prior to March 1, 1969, were eligible to receive immigrant visas. On June 30,

1970, the final date of validity of Schedule applications, Bulletin No. 8–80 issued by the Department of Labor, provided that only persons with priority dates prior to April 22, 1969, were eligible to receive immigrant visas. This Bulletin issued on the same day as the Directive, February 7, 1970.

3. The defendant concedes that plaintiffs' priority positions would have been called before this publication had their precertifications not expired under the terms of the unpublished Directive. The publication does not therefore render this aspect of the case moot. *Cf.* Diffenderfer v. Central Bapt. Church, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (January 11, 1972).

Traffic Ass'n v. United States, 268 F. Supp. 90 (D.D.C.1967), affirmed without opinion, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (3d Cir. 1969).

*Pharmaceutical Manufacturers Ass'n, supra,* involved a regulation of the Federal Drug Administration which described how much evidence would amount to "substantial evidence" of effectiveness required under the relevant Act for approval of a new drug. The Court stated that "[t]he basic policy of Section 4 [of the Administrative Procedure Act, 5 U.S.C. § 553] at least requires that when a proposed regulation of general applicability has a substantial impact on the regulated industry . . . notice and opportunity for comment should first be provided." Upon finding that the regulation in question had a substantial impact on the members of the plaintiff-association, the Court invalidated the regulation as not having been adopted pursuant to the notice and opportunity for hearing requirements of § 552.

In *National Motor Traffic Ass'n, supra,* the Court invalidated an informal voluntary procedure established by the ICC for restoration of past charges illegally exacted from shippers by carriers, because the procedure was announced without notice and publication pursuant to § 553. The Court found that the agency action was not so insignificant in nature and impact as to fall outside the rulemaking requirements of that section.

Under the impact test the impact in question must involve new rights and obligations to transform procedure into substance. This requirement is described in Texaco, Inc. v. Federal Power Commission, *supra,* where a regulation requiring monthly compound interest on refunds ordered by the FPC was held to constitute the imposition of rights and obligations. Because of the agency's failure to comply with § 553 the regulation was held invalid.

Assuming that the impact test is appropriate here, the question remains whether the Directive imposed new rights and obligations or, instead, interpreted how statutory rights and obligations may be met in view of a changed labor market situation.

■ The more conventional test for determining the applicability of § 553 has been to consider whether the rule in question is a legislative rule, that is the "product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the legislative body". 1 Davis, Administrative Law Treatise § 5.03 (1958). Thus it has been held that § 553 covers only rules or regulations which have the force of law. American President Lines Limited v. Federal Maritime Commission, 114 U.S.App.D.C. 418, 316 F.2d 419 (1963); Garelick Mfg. Co. v. Dillon, 114 U.S.App.D.C. 218, 313 F.2d 899 (1963); Mitchell v. Edward S. Wagner Co., 217 F.2d 303 (2d Cir. 1954); In re Petition of Chin Thloot Har Wong, 224 F.Supp. 155, 165 (E.D.N.Y.1963); Garcia & Vega v. United States, 27 Cust.Ct. 245 (3d Div. 1951). It is significant that the "impact" cases discussed above involved apparent legislative rulemaking, with the possible exception of the National Motor Freight Traffic Ass'n case.

■ It is clear that the Schedule C, Precertification List, and its predecessor are not legislative rules, assuming the label "rule" even applies to the determination of fact they represent. Nor is the practice of using such schedules as aids in complying with the mandate of 8 U.S.C. § 1182(a) (14) a legislative rule, even though this practice was announced in the Federal Register and was preceded by Notice of Rulemaking. No such legislative rulemaking authority is conferred on the Secretary of Labor by 8 U.S.C. § 1182(a) (14).

■ The authority that section does confer on the Secretary is the power and obligation to make a fact determination regarding the domestic labor market "at the time of [a visa] application and [an applicant's] admission to the United States." Thus the *statutory* finding for

a certification under this section is to be distinguished from the finding derived through a "precertification" schedule. Precertification is a labor market determination made a substantial and significant length of time in advance of the moment the visa application is accepted for processing; the very term *precertification* carries this connotation. *See generally*, Gordon & Rosenfield, Immigration Law and Procedure §§ 3.7, 3.8 (1969). The Secretary has no statutory authority to confer in advance of the time of processing and admission a binding certification interest which is not subject to modification (as here) or outright revocation before the processing date because of adverse changes in the labor market. Any other construction of the statute would frustrate its announced primary purpose of protecting workers already in the United States.[4]

■ The extent to which Schedule C or precertifications thereunder may legally guide the Secretary's determination at the time of statutory certification is not a matter of discretion or agency policy, but depends on the state of the labor market at that time. The less the labor market has changed in the interim between the precertification and statutory certification, the greater the role of the Schedule. Depending on the state of the labor market, the Secretary may disregard the Schedule entirely, adopt it entirely or, as he apparently does here, use it to identify occupations not in such short supply as to require no further finding of fact at the time processing commences, but nonetheless numerous enough so that proof of an individual job offer in one of the listed occupations would satisfy the requirements of 8 U.S.C. § 1185. Thus the schedules and the precertifications thereunder are aids which may be disregarded to the extent that not to do so would be inconsistent with the Secretary's duty under 8 U.S.C. § 1184. *Cf.* American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538–539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970).

■■ A broad application of a substantial impact or outcome determinative test for deciding whether a rule is covered by § 553 is therefore not appropriate here in any event, since the impact derives from a change in the labor market and not a substantive policy change by an agency. The Directive creates no new rights or obligations because the status conferred by the precertifications has no legal significance unless it is subject to such an impact. Even assuming that precertification represented a "substantive" right, it remains true that procedural requirements may occasionally affect substantive rights, but this does not make a procedural regulation a substantive one. Ranger v. F.C.C., 111 U.S.App.D.C. 44, 294 F.2d 240, 244 (1961).

4. The 1952 enactment excluded employment-seeking aliens only *if* the Secretary certified that an adverse labor market existed. Act of June 27, 1952, ch. 477, Title II, ch. 2, § 212(a) (14), 66 Stat. 182. The 1965 amendment excluded such aliens *unless* the Secretary certified affirmatively that an adverse labor market *did not exist*. 8 U.S.C. § 1182(a) (14) (1970).

Even under the more liberal, unamended version of subsection (a) (14) the inquiry as to the state of the labor market was at the time of entry: "It is the opinion of the committee that this provision [(a) (14)] will adequately provide for the protection of American labor against an influx of aliens entering the United States for the purpose of performing skilled or unskilled labor where the economy of individual localities is not capable of absorbing them *at the time they desire to enter this country*." [Emphasis supplied] H.R.Rep. 1365, 82 Cong., 2d Sess. (1952), U.S.Code Cong. & Admin.News 1952, pp. 1653, 1705. The 1965 amendment left that aspect unchanged as the amendment was directed at "strengthening" the "[s]afeguards to protect the American economy from job competition and from adverse working standards as a consequence of immigrant workers *entering* the labor market". [Emphasis supplied] S. Rep. 748, 15, 89 Cong., 1st Sess. (1965), U.S.Code Cong. & Admin.News 1965, pp. 3328, 3329, *see* H.R.Rep. 745, 80 Cong., 1st Sess. (1965), *cf.* Cobb v. Murrell, 386 F.2d 947, 950 (5th Cir. 1967).

■ Although the Directive did not amount to legislative or substantive rulemaking under § 553 this does not necessarily mean that it is not subject to the publication requirements of § 552. Section 552 of Title 5 provides in pertinent part:

(a) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which, the employees . . . from whom *and the methods whereby,* the public may obtain information, *make submittals* or requests, or *obtain decisions;*

. . . .

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has *actual* and *timely* notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. . . . .
[Emphasis supplied]

It is conceded herein that the unprocessed visa application form was returned to each plaintiff at the time his or her precertification became no longer valid without proof of a job offer. With these forms was a communication, according to plaintiffs' counsel, that revalidation could be obtained upon submission of proof of a job offer. This constitutes *actual notice* of the *terms* of the Directive as far as they adversely affected the interests of the plaintiffs.

The question remains, however, whether such notice was timely, for the plaintiffs received these communications not at the time the Secretary determined that pending precertifications should expire within a year of the issuance of the Directive, but on or about the date of the expirations themselves. Did this delay adversely affect the opportunity of the plaintiffs to secure visas, and, if it did, should the notice as to them be held untimely and therefore invalid?

Plaintiffs submitted no proof nor do they appear to allege that the delay—as distinguished from the expirations themselves—adversely affected them. It may be hypothesized that had they known that their precertifications might "expire" before their visas were processed they would have initiated attempts before the expiration dates to secure job offers with which to revalidate their precertifications. There is no indication that these attempts would have been made, that such attempts would have met with success or were likely to have met with success.

Moreover, the plaintiffs were on notice that their status was subject to a change in the labor market, lack of actual notice of that change notwithstanding. There is no question that had the Directive been effective immediately with regard to pending certifications, immediate notice to the plaintiffs would have been valid. The fact that the Secretary withheld the effect of the Directive as to the plaintiffs for at least one year and only notified them of the terms of the Directive at the time the terms became effective as to them should not render these persons exempt from the requirement for revalidation.[5]

The foregoing are the findings pursuant to F.R. Civ.P. 52(a).

The complaint is dismissed, with costs.

So ordered.

---

5. The defendant's contention that because plaintiffs are aliens they are not part of the "public" for whose "guidance" agency statements of general applicability are to be published pursuant to 5 U.S.C. § 553 (a), and that, therefore, that section is not applicable to the Directive because it affects aliens, is of doubtful merit. *Cf.*

Attorney General's Memorandum on the Public Information Section of the Administrative Procedure Act (1967) 5–6. In view of the holding that the plaintiffs had actual and timely notice of the terms of the Directive the question raised by this contention need not be reached.