Ignacio F. LEWIS–MOTA et al.,
Plaintiffs-Appellants,

v.

The SECRETARY OF LABOR,
Defendant-Appellee.

No. 99, Docket 72–1533.

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1972.

Decided Nov. 15, 1972.

Antonio C. Martinez, New York City, for plaintiffs-appellants.

Stanley H. Wallenstein, Sp. Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Joseph P. Marro, Sp. Asst. U. S. Atty., of counsel), for defendant-appellee.

Before HAYS, OAKES and TIMBERS, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from an order dismissing the complaint. 337 F.Supp. 1289 (S.D.N.Y.1972). It raises not insignificant questions concerning the applicability of the Administrative Procedure Act, 5 U.S.C. § 551 et seq., to certain procedures of the Secretary of Labor in connection with the entry of aliens for the purpose of performing labor in the United States. A complete description of the factual background of this case is found in the district court's opinion and it need only be summarized here.

This is a class action brought by aliens seeking to enter and reside in the United States as permanent residents. Such aliens not only need a visa for entry, but both at the time of application for a visa and at the time of admission there must be a certification by the Secretary of Labor that (a) there are insufficient "able, willing, qualified and available" domestic workers and that (b) the alien's admission "will not adversely affect the wages and working conditions" of similarly employed American workers. Immigration and Nationality Act § 212(a)(14), 8 U.S.C. § 1182(a)(14).

To simplify the determination involved, the Secretary of Labor has in the past from time to time published "schedules" listing certain occupational categories. One such schedule known as Schedule C originally listed occupations found to be in short labor supply generally, but not nationally, and was subject to continuous review.[1] An occupation listed on the original Schedule C ex-empted an alien applicant from showing that he had a specific job offer and submitting a statement of his qualifications before he would be eligible to receive certification by the Secretary.

On January 23, 1969, a new Schedule C, setting forth a "Precertification List" and abolishing the original Schedule C was established after due notice.[2] See 29 C.F.R. § 60.3(c) (1969). While changing other aspects of the original Schedule C, the new Schedule C continued the practice of exempting aliens engaged in listed occupations and destined for listed geographic areas from the requirement of showing a specific job offer. It provided specifically that changes and deletions from the list would be made as required. Appellants were either certified under the old Schedule C or precertified under the new Schedule C. For ease of comprehension, like the district court we will adopt the term "precertification" to refer to that certification at the time of application for a visa as opposed to a certification at the time of admission. Precertification gave appellants priority over other applicants in seeking visa approval.

On February 9, 1970, the Secretary of Labor, without first publishing in the *Federal Register*, issued a Directive which suspended the entire Schedule C precertification list and provided that previously issued precertifications would be valid only for a year from the date of their issue or until June 30, 1970, whichever were later. These appellants' precertifications expired in June and July of 1970, and each of them was notified by his respective consulate of such expiration and the procedure for revalidating his certification by way of submitting proof of a job offer was explained to him. Revalidation in turn would restore an alien's original priority position in the line for visa processing.

---

1. The original Schedule C was preceded by a notice of proposed rule making on December 23, 1966. 31 Fed.Reg. 16466–16469 (1966). It was thereafter added to Schedules A and B. 32 Fed.Reg 867 (1967).

2. Notice of Proposed Rule Making, 33 Fed. Reg. 17244 (1968).

The Directive suspending the said Schedule C precertification list was not in fact published in the *Federal Register* until almost a year after its issuance, February 4, 1971. 36 Fed.Reg. 2462 (1971). Appellants argue that the omission of the Secretary to publish the suspension Directive was contrary to the Administrative Procedure Act and particularly 5 U.S.C. § 553(b), (d), and 5 U.S.C. § 552(a)(1). The court below held that § 553 [3] did not require publication on the ground that the test for applicability is whether the particular directive in question is a "legislative rule" and that the issuance of the Directive in question was not a legislative rule but rather a "fact determination regarding the domestic labor market . . . ." 337 F.Supp. at 1294. As will be seen below, we disagree.

The district court also held that the communication from the appellants' consulates announcing expiration and indicating the procedure for revalidation at the time of the expiration of their precertifications was actual notice of the terms of the Directive and that such notice was timely because there was no showing of prejudice from the delay, especially in view of the fact that the appellants were previously aware that their status was subject to a change in the labor market. Accordingly the court found that Section 552 of Title 5 [4] did not require publication of the Directive. Our determination of appellants' § 553 claims makes review of this finding unnecessary.

■ Under 5 U.S.C. § 551(4) a rule is defined as "an agency statement of general or particular applicability and future effect designed to implement . . . law or policy . . . ." Under 5 U.S.C. § 553(b), (c) and (d) 30 days' notice of proposed substantive rule making and an opportunity for interested persons to submit written data are required. None of the exceptions to the publication requirement are applicable here. The Directive did not relate to "agency management" under the exception in 5 U.S.C. § 553(a)(2). It was not an "interpretative rule," or a "general statement of policy" within the exceptions of 5 U.S.C. § 553(b)(A). While the Secretary strenuously argues that he was merely announcing "a general statement of agency procedure or practice" within § 553(b)(3)(A), the label that the particular agency puts upon its given exercise of administrative pow-

---

3. Section 553 provides in pertinent part:
     (b) General notice of proposed rule making shall be published in the Federal Register . . . .

     Except when notice or hearing is, required by statute, this subsection does not apply—
     (A) to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice

     (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
     (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
     (2) interpretive rules and statements of policy; or
     (3) as otherwise provided by the agency for good cause found and published with the rule . . . .

4. Section 552 provides in pertinent part:
     (1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—
     (A) descriptions of its central and field organization and the established places at which, the employees . . . from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

     (E) each amendment, revision, or repeal of the foregoing.
     Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. . . .

er is not, for our purposes, conclusive; rather it is what the agency does in fact. *See* Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

■ We look then to what the Directive in fact did. We find that it changed existing rights and obligations by requiring aliens of the class of appellants to submit proof of specific job offers as well as a statement of their qualifications; it thereby made it more difficult for employers to fill vacancies in the occupations no longer precertified. By virtue of this substantial impact both upon the aliens and employers, notice and opportunity for comment by the public should first be provided. *See* Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858, 863 (D. Del.1970); National Motor Freight Traffic Association v. United States, 268 F.Supp. 90, 96 (D.D.C.1967) (3-judge court), aff'd per curiam, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968); Seaboard World Airlines, Inc. v. Gronouski, 230 F.Supp. 44, 46 (D.D.C.1964). As was stated in a similar case arising under the Natural Gas Act, the publication requirement of § 553 "enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3rd Cir. 1969) (order requiring payment of interest compounded monthly on FPC-ordered refunds must comply with publication provisions). *See also* NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764–765, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion). Thus we hold that the procedure by which the Directive was promulgated violated the requirements of 5 U.S.C. § 553.

■■ But to hold the Directive invalid does not end our consideration of the case. What relief should be or can be accorded to the class appellants represent? What we have done is to declare the Directive invalid until 30 days after it was actually published on February 4, 1971, but valid thereafter. It might be suggested that since certification upon admission is still required and the Secretary has now determined that admission of these aliens would affect the American labor market, to give relief now would be improper. Put another way, it might be suggested that the case has been mooted by the issuance of the Directive in February 1971 without prior admission of these aliens. These points, however, presuppose that had the Directive been published before its actual date, there would have been no adverse comment or information furnished which would have caused the Secretary to recall it, something we do not and cannot know. Furthermore, the Secretary conceded below that appellants' priority position on the visa approval list would have been reached between (a) the date of expiration of their precertifications (in June or July of 1970) under the invalid Directive and (b) the date of March 4, 1971 (30 days after actual publication). 337 F.Supp. at 1293, n. 3. Thus, this case is not moot. *Cf.* Diffenderfer v. Central Baptist Church, 404 U.S. 412, 414, 92 S.Ct. 574, 30 L. Ed.2d 567 (1972). However, even though appellants' priority position would have been reached, appellants still must be "otherwise admissible" before being granted a visa. *See* Yik Shuen Eng v. INS, 464 F.2d 1265 (2d Cir., 1972), at 1267. Appellants should therefore be given a reasonable time within which to apply for admission under the same circumstances as if their priority position on the visa approval list were reached.

Judgment reversed and remanded for proceedings in accordance with this opinion.

HAYS, Circuit Judge.

I dissent.