CHESHIRE CONVALESCENT CENTER, INC. *v.* COMMISSION
ON HOSPITALS AND HEALTH CARE

COURT OF COMMON PLEAS    NEW HAVEN COUNTY    FILE NO. 110372

Memorandum filed December 9, 1977

*Gitlitz, Ronai & Berchem,* for the plaintiff.

*Carl R. Ajello,* attorney general, and *William J. Clark,* assistant attorney general, for the defendant.

JACOBSON, J.  This appeal seeking judicial review and reversal of a decision of a state agency, the commission on hospitals and health care, hereinafter the commission or the CHHC, was brought pursuant both to § 4-183 of the General Statutes, the Uniform Administrative Procedure Act, hereinafter the UAPA, and to § 19-73p of the General Statutes.  The commission denied by a five-to-four vote the plaintiff's application made pursuant to

§ 19-73m of the General Statutes for permission to conduct a capital construction project which would have included the right to construct a 120-bed addition for the care of sixty chronic and convalescent home patients and sixty rest home with nursing supervision patients at an estimated project cost of $1,830,000. Although the plaintiff's project had, after extensive review and analysis, obtained a recommendation for approval from the Northwest Connecticut Health Systems Agency, Inc., a hearing panel of commissioners, after hearing testimony at a November 17, 1976 hearing, recommended that the full commission deny the application.

At its regularly scheduled January 25, 1977 meeting, the commission considered the recommendation of the panel, dated January 18, 1977, to deny the application, and adopted the panel's negative recommendation by a vote of five to four, with the tenth commissioner present, chairman pro tem William J. Lavery, not voting. The panel's recommendation thus became the decision of the commission:

"This recommendation [to deny] is made for the following reasons:

"1. The *criteria* used by the Commission as a guideline for allocating nursing home beds shows the Northwest Health Service Area to be overbedded by 64 beds and the community of Cheshire overbedded by 258 beds.

"2. While the high quality of care at the Cheshire facility is recognized, such quality of care in and of itself cannot be deemed as sufficient reason to justify the construction of additional inpatient health resources in a community which is overbedded by Commission *guidelines*." (Emphasis added.)

The plaintiff, also referred to as the applicant, thereupon appealed to this court claiming a reversal and modification of the decision under § 4-183(g) on the ground that substantial rights of the plaintiff had been violated by the decision.

I

The plaintiff is a Connecticut corporation and is licensed by the state department of health to operate a chronic and convalescent nursing home for eighty patient beds, i.e., a skilled nursing home, and a rest home with nursing supervision for forty patient beds, i.e., intermediate care beds, in the town of Cheshire. The principals of the corporation are Andrew J. Barth and Evelyn Barth, and their son, Andrew J. Barth, Jr.

On or about October 12, 1976, pursuant to § 19-73m the plaintiff made application to the defendant commission for permission to conduct a capital construction project in the town of Cheshire for the purpose of constructing an additional sixty-bed skilled nursing facility and an additional sixty-bed rest home with nursing supervision facility at an estimated project cost of $1,830,000. Simultaneously with the filing of the application with the commission, the applicant also filed a copy with the Northwest Connecticut Health Systems Agency, Inc., hereinafter the health systems agency or the HSA. The health systems agency was created pursuant to congressional mandate by the National Health Planning and Resources Development Act of 1974, 42 U.S.C. § 300k et seq. It replaces the former Comprehensive Health Planning Agency mentioned in § 19-73m in Connecticut's health care regulatory superstructure. Such agencies exercise a fact finding and health resource allocation function in specified geographical health planning areas known as "health service areas." Health systems

agencies, such as the Northwest agency which had geographical jurisdiction with respect to Cheshire's application, have advisory functions only, and the ultimate decision with respect to capital construction projects initiated by application pursuant to § 19-73m is a final adjudicatory function of the CHHC. See §§ 19-73m, 4-166 (2).

On or about October 13, 1976, the HSA commenced its deliberations preparatory to rendering its advisory recommendation. Members of the HSA review panel paid a personal site visit to the applicant's 120-bed facility, and the review committee, as well as the board of directors of the agency, deliberated on the project at four separate meetings held on November 8, 1976, November 16, 1976, November 23, 1976, and December 16, 1976. At the various fact finding sessions before the diverse subgroups of the HSA, the applicant was asked by the HSA to explain away, if it could, the guideline or standard then in use by the CHHC in deciding or adjudicating requests made pursuant to § 19-73m. That standard or guideline, to the effect that "70 nursing home beds per 1,000 population aged 65 or over" would be a rule to be applied by the CHHC as a "statewide ceiling" for allocating capital construction of nursing home beds, was adopted by the commission, at its May 13, 1975 meeting. That rule was developed as a result of recommendations made to the CHHC by a special study group, i.e., the Long Term Care Task Force, which found that a moratorium on the issuance of certificates of approval for nursing home beds was necessary in order to determine how many of 5700 nursing home beds previously authorized by the commission's predecessor, the council on hospitals, would be actually constructed and placed in service.

At the HSA hearings, the applicant's counsel questioned the validity of an administrative

agency's imposing and adopting, without public comment or hearings, a moratorium rule on what, both de jure and de facto, was a license for capital construction projects. And although the statistics developed by the commission by the use of that formula showed that the subject health service area in general and Cheshire in particular were over-bedded, the applicant's counsel contended before the HSA that the adoption of the rule of 70 beds per 1000 aged population was not merely a guideline but an "agency statement of general applicability that implements . . . or prescribes law or policy" and as such was a regulation as defined by the UAPA. See General Statutes § 4-166 (7). The HSA was, therefore, told that the moratorium rule, as such a regulation, was required to have been adopted and promulgated in accordance with the regulation adoption or rule-making procedure prescribed in detail in the UAPA. See General Statutes § 4-168 (a), (b) (concerning notice and hearings); § 4-169 (concerning approval of regulations by the attorney general); and § 4-170 (concerning the legislative regulation review committee). And since the CHHC had never complied with the UAPA rule-making procedures, reference to that guideline or criteria would, the HSA was told, be improper.

Indeed, on October 28, 1975, Deputy Director Sarah S. Hirakis, the proponent of the May 13, 1975 motion to adopt the guideline, issued a memorandum to the commission members in which, after restating the text of the May 13, 1975 guideline as adopted, she admonished the commission members of the following legal concern: *"Since the Attorney General's Office has ruled that a moratorium cannot be legally declared, recommendations #14 and #15, recommending bed policy allocation, are therefore void."* (Emphasis added.) Despite, however, the admitted and patent illegality, the memorandum

concluded with the staff's recommendation that the statewide ceiling of 70 beds per 1000 population be adopted as a rule and guideline, but with the deletion of the three words "after the moratorium."

Although some effort was made by the applicants before the HSA with respect to directing a legal attack on the validity of the CHHC's ceiling as applied to them, their presentation included a thorough documentary record concerning the other statutory criteria which the CHHC may consider in passing upon a capital construction application under § 19-73m. Those criteria are set forth in § 19-73k.

The applicant's presentation attempted to demonstrate that its rehabilitative therapy program, its function as a resource and teaching institution, its service to patients outside the health service area, its community care or home health care program, and its unusually high ratio of rehabilitated patients as compared to other institutions placed Cheshire in the category of a specialized facility whose services were not duplicated within the health service area. Thus, even if the 70 beds to 1000 population rule were valid, Cheshire contended that its unique program placed itself, because of the quality and nature of its care, outside the strictures of that limitation. The HSA agreed.

The hearing before a panel of three members of the commission on hospitals and health care was held and concluded on November 17, 1976. The hearing, as announced by the panel chairman, Francis P. DellaFera, was conducted pursuant to the provisions of the UAPA. Thus the application for permission to conduct the capital construction project was a contested case within the meaning of § 4-166 (2) of the UAPA, thereby rendering

applicable the procedural protections of §§ 4-177 and 4-178 relating to the presentation of evidence, the right of cross-examination, and the duty of an agency to make "[f]indings of fact . . . based exclusively on the evidence and on matters officially noticed." See §§ 4-177 (g) and 4-178 (3). At the hearing, the applicant again introduced the same evidence presented to the HSA concerning: (a) its unique rehabilitation-oriented therapy services; (b) its home health care and after-care program (community care services); (c) its National Health Institute grant for oncology; (d) its teaching programs; and (e) its excellent survey reports by the state department of health, the Connecticut department of social services and their Medicare fiscal intermediary, the Travelers Insurance Company. Further evidence was introduced at the November 17, 1976 panel hearing to document the success of the applicant's rehabilitative therapy program wherein 77 percent of the applicant's patients are discharged alive from the center and 51 percent of those discharged go directly back to their homes. Documentation was offered which showed that the discharge ratio far exceeded those of comparable facilities in the state of Connecticut.

With respect to the issue of the bed-need statistical guideline, the applicant introduced evidence to demonstrate that even if the statistical guideline were not an invalid regulation, the patient occupancy census of the Masonic Home and Hospital and the Elim Park Baptist Home, which are nursing homes operated in the towns of Cheshire and Wallingford by nonprofit fraternal orders, distorted the statistical cross-section and rendered it inaccurate. The applicant contended that those two fraternal orders gave preference to relatives of aged members as well as to members themselves and thus drew their patient populations from all

over the state of Connecticut and not necessarily from the region. Thus the licensed beds of those two institutions, the plaintiff claimed, may have had a distorting effect on the commission's statistical bed-need formula for the town of Cheshire.

There was no opposition to the application by any other nursing home or by any member of the public. In fact, the only other appearances at the hearing, other than those of the applicant and its representatives, were by two "public" intervenors who, after citing the favorable experiences of their family members with the applicant's current facility, urged approval of the application. The panel did receive in early December the favorable report and recommendation of the Northwest Connecticut Health Systems Agency, Inc., referred to above.

The conclusions contained in the January 18, 1977 panel report which recommended a denial of the application and which were adopted by the commission on January 25, 1977, are set forth above.

Prior to the commencement of the commission hearing but after the receipt of a copy of the January 18, 1977 panel report, the plaintiff's counsel prepared and filed a formal document entitled "Objection to Regulations and Reservations of Rights" in which he claimed that the rule of 70 beds to 1000 population was a formula which "implements, interprets, or prescribes law or policy"; General Statutes § 4-166 (7); "but [which has] not been promulgated as regulations in accordance with the procedural provisions of § 4-168, § 4-169, § 4-170 and § 4-172 of the Uniform Administrative Procedure Act ('UAPA'). This objection applies to the use or implementation of the Commission's guideline proposed by the Long Term Care Task Force,

and adopted by the Commission on or about September 23, 1975. Said guideline, applicable to the allocation of skilled nursing home beds only but not to rest homes with nursing supervision, purports to apply a limitation on the construction of skilled nursing home beds to those towns wherein the existing nursing home beds do not exceed the following formula limitation: 70 skilled nursing home beds per 1000 population age 65 or over. The failure to adopt said regulation in accordance with the applicable provisions of the UAPA renders said limitation to be inapplicable to the current application."

In addition to raising the other legal claims set forth herein, the applicant's "reservation" concluded with the statement that the applicant "appears herein under a reservation of all of the above rights, and its participation in these proceedings and the filing of its objections to the substance as well as form of the panel report shall not be construed as a consent and waiver of any of its objections to form and substance of the proceedings herein. . . ."

At the commencement of the January 25, 1977 commission hearing, the applicant's counsel filed an informal "Motion to Correct the Panel Report" and a "Request to Conduct Cross Examination to File Exceptions and to Conduct Oral Argument," in accordance with the provisions of § 4-177 (c) and § 4-178 (1) and (3). The request to conduct oral argument was granted but the request to cross-examine, which was directed at obtaining information from staff health planner Edward Paterwic as to the foundation of certain of the statistics, was denied. A subsequent motion for rehearing, aimed at presentation of recent evidence relating to the Masonic Home and Elim Park's statistical relevance to the application, was denied.

## II

The plaintiff claims that its application for permission to conduct a capital construction project required of the commission a determination and an adjudication of its request after the receipt of evidence and after a public hearing. The commission is empowered to "approve, modify or deny such request, or make a finding of recommendations based upon the said request." General Statutes § 19-73m. Thus, such a proceeding constituted for the purposes of the Uniform Administrative Procedure Act a contested case since it was a proceeding related to the determination of a right akin to a license "in which the legal rights . . . of a party are required by . . . [§ 19-73m] to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ." General Statutes § 4-166 (2). And since § 4-177 of the UAPA, which sets forth the procedure to be followed in contested cases, requires that the agency's findings of fact shall be "based exclusively on the evidence," the commission's blatant admission in its final decision that it had not adopted any standards or criteria pursuant to which it denied the applicant's request for sixty rest home beds renders that portion of the decision unsupported by any evidence and renders it clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. General Statutes § 4-183 (g) (5).

That portion of the commission's decision which denies the applicant's request to construct sixty nursing home beds is similarly void since the commission applied to the applicant a rule of general applicability which implemented law, i.e. § 19-73m, or policy without having promulgated that "regulation" in accordance with the prescribed rule-making procedure set forth in § 4-168 et seq. of the Uniform Administrative Procedure Act. The plaintiff will

demonstrate quite clearly that the 70 beds per 1000 population guideline or criterion constituted a substantive or legislative rule designed for future adjudication or decision making and as such was required, in accordance with the overwhelming weight of authority, to be enacted only after the public notice and comment provisions of the UAPA had been satisfied.

Furthermore, and in the alternative, even if the 70 beds per 1000 population guideline did not qualify as a substantive or "legislative" rule, the commission's denial of the applicant's request must be reversed because of its arbitrary and capricious nature and because of its clear appearance as the product of an abused discretion. The evidence in the record of the proceedings clearly demonstrated the applicant's unique rehabilitative therapy procedures, drawing patients from a wide geographical area and returning an unusually high percentage of patients to their homes, placed the facility outside the ". . . area served" and demonstrated in accordance with the criteria set forth in § 19-73k that the "community or regional need for . . . [the applicant's rehabilitative therapy] service" was present. Furthermore, even if the substantive reasons set forth above are insufficient to reverse the application, the peremptory denial of the right of cross-examination to the applicant's counsel by the commission at the January 25, 1977 hearing was clearly violative of § 4-177 (c) and § 4-178 (3) of the Uniform Administrative Procedure Act, since such cross-examination was necessary for the applicant to probe the validity and accuracy of the 70 beds per 1000 population formula used by the panel as a predicate to its denial of the applicant's request.

The appropriate remedy, if the applicant's contentions are sustained, is to remand the matter to the agency with a direction to grant the request

since the ninety-day limitation period for action on the application has long since expired. Since the failure to grant or deny the request within ninety days, as required by § 19-73m, was totally the by-product of the commission's failure to follow the UAPA, the court in the present case has the power, pursuant to § 4-183 (g) to "modify the decision . . . [as] substantial rights of the appellant have been prejudiced . . . ." Section 19-73p which governs appeals from this agency's decision is a statute affording broader relief since the court, acting thereunder, may grant "such relief as to equity may appertain."

### III

This court will discuss the plaintiff's claim that the denial of its request was based on the application of an illegal regulation which had not been promulgated as prescribed by the rule-making procedures of the UAPA since the court feels that that particular claim is dispositive of the appeal.

From the minutes of the commission meetings and its consistent application of the rule of 70 beds to 1000 population in other § 19-73m adjudications, it is apparent that the commission has attempted to transform what in reality and de facto is a "regulation" by substituting the words "criteria" and "guideline" in references thereto.

Section 4-166 (7) of the UAPA defines a "regulation" as "each agency statement of general applicability that implements, interprets, or prescribes law or policy . . . ." Section 4-168 (a) of the UAPA provides that, prior to the adoption of a regulation, the agency shall: "(1) Give at least twenty days' notice of its intended action. The notice shall include a statement of either the terms or substance of the intended action and the time when, the place where and the manner in which interested persons

may present their views thereon. The notice shall be published in the Connecticut Law Journal; (2) afford all interested persons reasonable opportunity to submit data, views or arguments, orally or in writing. In case of substantive regulations, opportunity to present oral argument shall be granted if requested by twenty-five persons, by a governmental subdivision or agency, or by an association having not less than twenty-five members provided notice of such request is made to the agency within ten days of publication. The agency shall consider fully all written and oral submissions respecting the proposed regulation. *No regulations may be adopted, amended or repealed by any agency, except as provided in subsection (b) of this section, until approval by the attorney general and the standing legislative regulation review committee, as provided in sections 4-169 and 4-170."* (Emphasis added.)

Additionally, § 4-168 (c) of the UAPA establishes that "[n]o regulation adopted after January 1, 1972, is valid unless adopted in substantial compliance with this section." Sections 4-169 and 4-170 of the UAPA require that proposed regulations be approved and reviewed by, respectively, the attorney general and the legislative regulation review committee. Section 4-172 mandates the filing of approved regulations with the secretary of the state and provides that a regulation is effective only upon such filing.

On January 25, 1976, prior to its appearance before the full commission, the plaintiff filed a written objection with the commission protesting the fact that the panel's decision was based on regulations not promulgated in accordance with the UAPA and taking exception to their use by the commission on the ground that they were void and illegal.

The evidence clearly indicates that the commission's nursing home bed allocation formula was not only intended as a regulation, but was indeed applied as a regulation despite commission characterization of it as a "criterion" and a "guideline." It is obviously an agency statement of general applicability that implements, interprets or prescribes law or policy. It is equally clear that, because the commission did not even make an attempt to comply with the UAPA rule-making provisions, the regulation could not have been lawfully adopted in accordance with the provisions of § 4-168 (a), and accordingly, is invalid as provided by § 4-168 (c). Not only is the 70 beds to 1000 population policy null and void but any action taken in reliance upon it is also null and void.

The conclusion that the criterion is a regulation which was not lawfully promulgated, that it is therefore void, and that actions taken upon it also are void is supported not only by the plain meaning of the UAPA and § 4-166 (7), but also by law from other jurisdictions. The determination as to whether a certain administrative agency statement constitutes a regulation commanding conformity to an administrative procedure act's rule-making process is often resolved by an analysis of how the rule or policy statement is used by the agency in future proceedings. Classifications and labels have been used by some courts in an attempt to delineate a legal distinction so that a "substantive" or "legislative" rule or policy, on the one hand, has led courts to conclude that the notice and hearing requirements of the act's rule-making procedure are to be followed. On the other hand, the short-hand description of a policy as being "interpretative" has led courts to conclude that such a statement is only the administrator's construction of a statute and an anticipation of what might be done by the courts

with that statute. See 1 Am. Jur. 2d, Administrative Law, § 95. But it appears that it is what the administrative agency does rather than "the precise source of its power which is of importance in classifying a rule or regulation as 'legislative' [substantive] or 'interpretative,' " 1 Am. Jur. 2d, Administrative Law, supra. "The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. See *Columbia Broadcasting System, Inc.* v. *United States,* 316 U.S. 407, 416–417 . . . (1942); *Public Service Comm'n of New York* v. *FPC,* 126 U.S. App. D.C. 26, 37, 373 F.2d 816, 827 (1967), rev'd on other grounds, 391 U.S. 9 . . . (1968). A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency." *Pacific Gas & Electric Co.* v. *Federal Power Commission,* 506 F.2d 33, 38 (D.C. Cir.). (Emphasis added.) See *Lewis-Mota* v. *Secretary of Labor,* 469 F.2d 478 (2d Cir.); *Texaco, Inc.* v. *Federal Power Commission,* 412 F.2d 740 (3d Cir.); *Noel* v. *Chapman,* 376 F. Sup. 1095 (S.D. N.Y.), aff'd 508 F.2d 1023 (2d Cir.), cert. denied 423 U.S. 824.

Thus, the label placed by the agency on the exercise of its administrative power is not determinative. It is what the agency does in fact that renders the most appropriate clue as to a policy's classification; *Lewis-Mota* v. *Secretary of Labor,* supra; and if a rule has a substantial impact on the rights and

obligations of parties who may appear before the agency in the future, it is a substantive or legislative rule requiring compliance with the notice and hearing provisions of the UAPA.

Application of the test set forth above indicates quite clearly that the 70 beds per 1000 population "guideline" is indeed a substantive rule since it establishes a rule of conduct which the agency is to apply in the future adjudications of nursing home beds. The issue on May 13, 1975, when that rule was adopted by the agency, was whether in subsequent administrative proceedings nursing homes could conform their conduct to that rule and whether the adjudicated facts conformed to the rule. Evidence adduced demonstrated that during 1976 the commission applied the rule as an adjudicatory principle to the applications of approximately seventeen nursing homes to determine whether their applications pursuant to § 19-73m should be granted. Thus, it applied an adjudicatory rule without conforming to the notice and hearing procedure as required by the UAPA.

According to the commissioners' comment in the Model State Administrative Procedure Act, which is the basis for the Connecticut UAPA; *Hartford* v. *Public Utilities Commission,* 30 Conn. Sup. 244; the purpose of public notice and a hearing prior to the adoption of a regulation is both to ensure, "so far as feasible, that all interested persons will have an opportunity to present their views," and also "to give some degree of assurance that the agency will, in fact, consider the arguments advanced by the affected parties." The commissioners' comment describes subsection (c) of § 3 of the Model Act, which is substantially identical to § 4-168 (c) of the Connecticut UAPA, and which invalidates any regulation not adopted in compliance with the act, as being "a sanction of consider-

able force." Commissioners' comment, § 3, Model State Administrative Procedure Act, 9C Uniform Laws Annotated (1967 Cumulative Pocket Part). The commissioners' prefatory note to the Model Act refers to the requirement of notice and an opportunity to present views as a major principle of the act. With respect to the requirements of prior publication of rules, the commissioners' comment to § 5 of the Model Act explains that "[b]asic principles of fairness require that before individuals are required to comply with administrative rules, a reasonable attempt should be made to give notice and opportunity to become familiar with their contents."

The commission, however, saw fit to promulgate a statewide nursing home construction moratorium and ceiling without notice or opportunity for hearing or the presentation of views, without submission to the attorney general or to the legislative regulation review committee, and without publication in the Connecticut Law Journal, all as required by the UAPA. In fact, the commission failed to comply with any of the provisions of the UAPA dealing with the promulgation and adoption of regulations.

Moreover, logic and common sense applied to the enactment of legislative or substantive rules by administrative agencies in the more familiar municipal context demonstrate quite clearly the error of the CHHC's method. For example, a zoning commission, pursuant to General Statutes § 8-3, the state enabling act, is prohibited from enacting a regulation "until after a public hearing in relation thereto, . . . at which parties in interest and citizens shall have an opportunity to be heard." Section 8-3 also mandates that a regulation adoption or change procedure be preceded by a newspaper notice published in sufficient time to give interested parties and members of the public an opportunity to pre-

pare and respond. Such a regulation adopting or amendment procedure is clearly a legislative function when performed by a planning and zoning commission. See *McCormick* v. *Stratford Planning & Zoning Commission,* 146 Conn. 380; *Mills* v. *Town Plan & Zoning Commission,* 144 Conn. 493.

A zoning commission acts in a legislative capacity when it amends its zoning regulations to provide that premises from which alcoholic liquor shall be dispensed shall not be closer than 1500 feet from each other. By analogy, if a municipal planning and zoning commission were to seek to implement a policy of general applicability with respect to liquor outlets, e.g., that they shall be located not closer than 3000 feet from each other nor be more numerous than 70 per 10,000 persons in the community, such a substantive legislative amendment to the regulations.could not be enacted until after compliance with the notice and hearing requirements of § 8-3. No responsible public official having experience with the enactment and modification of zoning regulations could be heard to contend otherwise.

The commission's recent use of the rule-making power pursuant to § 4-168 on April 19, 1977, indicates quite clearly that the commission should have acted differently. That recent employment of the power only serves to underscore the commission's failure to follow prescribed rule-making guidelines. On April 19, 1977, the commission published in volume 38, number 42, of the Connecticut Law Journal a "Notice of Intent to Adopt Regulations" pursuant to § 4-168 of the Uniform Administrative Procedure Act. Those sets of regulations as noticed were (1) proposed regulations to govern rate review and budget review criteria for hospitals as regulated pursuant to § 19-73o, and (2) proposed regulations to establish standards to provide for rules by which

previous grants of capital construction authority by the council on hospitals could be continued or terminated after hearing by the commission. The April 19, 1977 rule-making notice is a recognition and admission by the commission of a legal compulsion to provide members of the public and interested parties with the opportunity to be heard after due notice when a substantive rule is to be applied by the commission in the future with respect to the "termination of grants . . . [of] authority to undertake capital expenditures . . . ." What difference is there between the commission's recognition of its need to comply with the UAPA's rule-making process on April 19, 1977, in relation to future terminations of authority to construct nursing home beds and its failure to recognize the need to comply with the rule-making process on May 13, 1975, prior to promulgating the 70 beds per 1000 population rule which is a limitation on the authority to construct the same beds? ·Therefore, the commission's own subsequent conduct demonstrates its non-compliance with the UAPA and the application of a substantive rule to the plaintiff's application without such conformity.

Two cases recently decided have struck down the use of illegal regulations by administrative agencies set up to regulate hospitals and nursing homes. In *Franklin Square Hospital* v. *Health Services Cost Review Commission,* No. 82047 (Baltimore Cir. Ct. Mar. 20, 1975), remanded for modification, 277 Md. 93, a Maryland Circuit Court held that the "guidelines" of the Maryland hospital cost commission were rules and regulations within the meaning of the Maryland administrative procedure act. Since they were not adopted and promulgated in accordance with that law, they were "invalid and of no effect." Article 41 of the Maryland Code, subsection 244 (b), on which the decision was based,

defines "rule" as including "every regulation, standard, or statement of policy or interpretation of general application and future effect . . . adopted by an agency . . . to implement or make specific the law enforced or administered by it." Thus, it is very similar to our UAPA's definition of a regulation in § 4-166 (7).

*In the Matter of Sturman* v. *Ingraham,* 52 App. Div. 2d 882 (N.Y.), presented a fact situation closely analogous to the present proceeding. There, a decision of the state health commissioner denying an application for a certificate of need to construct and operate a nursing home was reversed and annulled and the commissioner was directed by the court to grant the application. The commissioner's decision had been based solely upon his having applied to the pending application "a newly announced guideline" which was not filed and published by the secretary of state as a rule or regulation as required by the New York Executive Law, and not enacted as a rule or regulation by the state hospital review and planning council.

The application in *Sturman* was a request to the state department of health for permission to construct and operate a nursing home with ninety beds. The New York statutory scheme applicable to such requests, § 2802 of the Public Health Law, required the commissioner to be "satisfied as to the public need for the construction." While the applicant's request was pending before the commissioner, the commissioner announced a "6 Point Program to Control Long Term Care Cost Increases." *Sturman* v. *Ingraham,* supra, 883. The program, having features quite similar to the May 13, 1975 recommendations of the Long Term Care Task Force which reported to Connecticut's commission, provided in pertinent part as follows: "Part of the announced Program is a map entitled 'Long Term Care Need.

Satisfaction by County—1975.' This map shows each county of the State. As can be seen from the key, the commissioner has fitted each county into one of the following three classifications: '[1] 90% or more of the 1975 need is satisfied. No further approvals are indicated at this time. [2] 75-89% of the 1975 need is satisfied. Additional approvals are possible where carefully documented local need is demonstrated. [3] 75% of the 1975 need is satisfied. Additional approvals are indicated.' The commissioner placed Westchester County in the first classification, i.e., '90% or more of the 1975 need is satisfied. No further approvals are indicated at this time.' " *Sturman* v. *Ingraham,* supra, 883–84.

Although a hearing officer there had recommended the approval of the application on its merits, the commissioner disapproved of the application because he had predetermined (p. 884), as a result of the application of the guidelines, that "[n]o further approvals are indicated at this time." When the guideline was attacked by the unsuccessful applicant Sturman on the same legal theory asserted here—that it was a rule or regulation not validly promulgated—the commissioner asserted the same defense relied on by the commission in the present case—that it was a mere guideline or criterion, but not a rule. Section 101-a of New York's Executive Law required that the enactment of an agency rule also be preceded by a formal rule-making procedure, and the New York statute defined a rule as: "1. Definitions. As used in this section . . . b. 'Rule' means the whole or part of each agency statement of general applicability or regulation or code that implements or applies law, or prescribes the procedure or practice requirements of any agency, including the amendment, suspension or repeal thereof, except such as relates to the organization or internal management of the agency." Section

101-a of the New York Executive Law, cited in *Sturman* v. *Ingraham,* supra, 884. That definition is identical to, or in pari materia with, the definition in § 4-166 (7) of the UAPA. When the commissioner in *Sturman* attempted to characterize its guideline as not being subject to the notice and hearing provisions of that rule, the court said (pp. 884–85): "In our opinion, insofar as appears from this record, the commissioner denied petitioner's application by applying to it that which the commissioner calls a mere 'guideline,' but which was in fact a rule or regulation which should have been previously filed in accordance with the above-cited constitutional and statutory provisions (see *People* v. *Cull,* 10 N.Y.2d 123). In *Cull,* Chief Judge Fuld, writing for a unanimous court, stated (pp. 126–129): 'The term, "rule or regulation," has not, it is true, been the subject of precise definition, but there can be little doubt that, as employed . . . it embraces any kind of legislative or quasi-legislative norm or prescription *which establishes a pattern or course of conduct for the future.* The label or name employed is not important and, unquestionably, many so-called "orders" come within the term. . . . We know that underlying the provision was the desire to have all rules and regulations affecting the public filed in one, easily available, central place. *We should not strive to read exceptions into the section or construe it so as to permit the official in charge of the bureau, commission or authority to avoid the necessity of filing by attaching the label "order" or "statement of policy" or some other term to what is essentially a rule or regulation.* The spirit and design of the constitutional provision are best effectuated by requiring the administrator, if he wishes the rules and regulations of his agency or department to be effective, to file them no matter what label is assigned to them.' " (Emphasis added.)

That decision is quite persuasive to this court.

Accordingly, this court feels that the commission's bed need criterion is invalid on the ground that it is an unlawful regulation not promulgated in accordance with the rule-making provisions of the UAPA. Any decision based on such a regulation, including the decision of the commission on January 25, 1977, is also void and of no effect.

Therefore, this court remands this case to the commission on hospitals and health care so that it may reconsider the application on its particular facts without reliance on the invalid bed need criterion.