UNITED STATES of America

v.

Ruth SHIELDS.

Civ. No. 87–219.

United States District Court, D. Vermont.

Dec. 11, 1989.

---

Helen M. Toor, Asst. U.S. Atty., Burlington, Vt., for the Government.

Alexander Scherr, Vermont Legal Aid, Inc., St. Johnsbury, Vt., for defendant.

## OPINION AND ORDER

COFFRIN, District Judge.

Plaintiff, the United States of America, commenced a foreclosure action in this Court against David and Ruth Shields on September 17, 1987, due to substantial delinquency on their rural housing loan administered by the Farmers Home Administration (the "FmHA"). A default judgment was entered against Mr. Shields on February 5, 1988. Mrs. Shields moved for summary judgment in her favor pursuant to Fed.R.Civ.P. 56(b) on January 3, 1989.

Mrs. Shields contends that the undisputed material facts in this case establish: (1) FmHA's failure to advise her of the availability of post-acceleration moratorium relief in 1986 violated FmHA regulations effective at the time, (2) FmHA's regulation barring post-acceleration moratorium relief conflicts with the provisions of the Housing Act of 1949 and is void, and (3) FmHA's failure, prior to acceleration, to assist Mr. Shields in preparing his family household budget before entering into a Supplemental Payment Agreement violated FmHA regulations.

For the reasons which follow, we grant in part and deny in part Mrs. Shields' motion for summary judgment. Specifically, we grant it regarding the post-acceleration moratorium issues, and deny it regarding the Supplemental Payment Agreement issue.

## UNDISPUTED MATERIAL FACTS

On January 8, 1982, David and Ruth Shields borrowed $36,400 from the United States in order to purchase a home in Danville, Vermont. They did so under the auspices of the Housing Act of 1949, as amended, 42 U.S.C. § 1441 *et seq.* (the "Act"). This loan program is administered by the Secretary of Agriculture (the "Sec-

retary") and the FmHA. Specifically, the Shields borrowed this amount pursuant to the rural housing provision in 42 U.S.C. § 1471(a)(3), enacted in 1961.

From the outset, the Shields applied for and received interest credits that substantially reduced their monthly payments. In 1982 and 1983, interest credits reduced their payments from $408 to $109 per month. In 1984, credits reduced their payments from $408 to $117 per month. Comparable interest credits were granted in 1985 and 1986. Nonetheless, as early as February 1983, the Shields were delinquent in making their monthly loan payments.

In December 1984, Mr. Shields entered into a repayment agreement with Richard Roderick, Assistant County Supervisor for the FmHA. The Shields brought their account current in January 1985. However, the Shields thereafter continued to demonstrate either the inability or unwillingness to make timely payments. Various FmHA officials communicated with the Shields throughout 1985, but the Shields rarely attended scheduled meetings with FmHA officials regarding their overdue payments.

On January 28, 1986, Mr. Shields met with Assistant County Supervisor Roderick. At that time, Mr. Shields applied for moratorium relief pursuant to 42 U.S.C. § 1475. The application had been signed by himself and Mrs. Shields. County Supervisor George Button denied the Shields' application two days later because their housing costs did not equal or exceed 35 percent of their household budget, a prerequisite for moratorium relief under regulations effective at that time. *See* 7 C.F.R. § 1951.313(a)(2)(i) (1986).

At the January 28 meeting, Mr. Shields discussed his various options with Assistant County Supervisor Roderick, including voluntary conveyance of the Danville residence. Mr. Shields entered into a Supplemental Payment Agreement meant to bring the Shields' account current by means of weekly $75 payments. Since Mr. Shields had failed to fill out the Household Financial Statement and Budget Form (the "Budget Form") that County Supervisor Button had previously mailed to him, calculations

performed at the meeting were based upon Mr. Shields' oral representations. The Shields subsequently failed to comply with the terms of this agreement. Due to the Shields' substantial delinquency and their failure to cooperate with the FmHA in its efforts to resolve the situation favorably, District Director Everett Bailey decided to accelerate their loan on March 24, 1986. The Shields did not appeal this decision.

It appears from the record that throughout the Shields' dealings with the FmHA Mr. Shields was the spouse who primarily, if not solely, handled the details surrounding the FmHA loan. Mrs. Shields made this fact quite evident whenever she was contacted by the FmHA. It also appears from the record that all face-to-face negotiations with the FmHA from 1982 to 1986 were conducted exclusively by Mr. Shields.

In April 1986, the Shields' home suffered a small fire, which the FmHA learned about a month later. Then, on May 13, 1986, Caledonia County Superior Court issued an abuse prevention order against Mr. Shields at the behest of Mrs. Shields. Mrs. Shields, who was pregnant at the time, was granted custody of their three children and possession of the FmHA-financed home. Mrs. Shields subsequently spent some time outside Vermont with her children. On July 23, 1986, County Supervisor Button learned that the Shields were separated and that Mrs. Shields continued to reside in the Danville home with the children.

While the FmHA continued to communicate with Mr. Shields throughout 1986, there is no evidence that the FmHA contacted Mrs. Shields regarding the status of the FmHA loan until she received a letter by certified mail from County Supervisor Button dated November 12, 1986. This letter noted that the Shields had failed to attend a November 12 meeting regarding their application for 1987 interest credits and stated that another meeting had been scheduled for November 25. Mrs. Shields telephoned the FmHA to inform them she would be unable to attend the November 25 meeting due to the Thanksgiving holiday and her pregnancy, which was in its third trimester. Since Mr. Shields failed to at-

tend the November 25 meeting as well, the Shields subsequently lost their interest credits for 1987, increasing their loan payments to $408 per month.

On January 27, 1987, Mrs. Shields gave birth to her fourth child. Then, on March 2, 1987, Mrs. Shield visited the FmHA office and met with County Supervisor George Button. She inquired into the status of the Shields' loan and was told the FmHA was in the process of foreclosing. She sought information regarding the options available to her, pointing out that she was receiving regular payments from the Department of Social Welfare and was willing to assume the entire loan obligation herself. She also explained to County Supervisor Button that, after separating from Mr. Shields, she had been out of the state for a period of time. Therefore, she had not received information regarding the status of the FmHA loan and had not known Mr. Shields had not been making loan payments as he had previously assured her he would.

During the next two months, Mrs. Shields communicated on a number of occasions with the FmHA's county and state offices. She gathered information on the FmHA loan and inquired into what she must do to prevent foreclosure. On April 7, 1987, Mr. Shields filed for divorce. Three days later, County Supervisor Button advised Mrs. Shields that she could apply for interest credit and/or moratorium relief if she so desired. On April 28, County Supervisor Button reaffirmed this advice after conferring with the FmHA's state office, and gave Mrs. Shields a moratorium application.

Mrs. Shields submitted this application the next day. She explained on the application form how she had not known of Mr. Shields' failure to make payments the previous year. She also stated that Mr. Shields had assured her when they separated that he would continue making the loan payments so that she and the children would have a place to live. Therefore, during the period of time she was outside Vermont with her children, she had no reason to believe that the FmHA loan was in default. Nor did the FmHA contact her regarding the loan's status. Furthermore, she opined that Mr. Shields had ceased making payments in an attempt to gain custody of the children.

On May 26, 1987, Mrs. Shields' application for moratorium relief was denied by County Supervisor Button. The sole articulated reason for the denial was an FmHA regulation, which had become effective February 4, 1987, prohibiting post-acceleration moratorium relief. The United States subsequently filed its foreclosure action in this Court.

## DISCUSSION

Mrs. Shields argues that the FmHA's failure to advise her of the availability of moratorium relief in 1986, after she and Mr. Shields separated, violated FmHA servicing regulations. She also contends that the current regulation barring post-acceleration moratorium relief is in conflict with the Act. Finally, she maintains that Assistant County Supervisor Roderick violated FmHA regulations by entering into a Supplemental Payment Agreement with Mr. Shields without the benefit of a properly completed Budget Form. Each of these issues will be considered in turn.

A. *The Duty to Advise Mrs. Shields of The Availability of Moratorium Relief in 1986*

According to servicing regulations effective in 1986, County Supervisor Button had a duty to advise Mrs. Shields "in writing of the possible availability of a moratorium when [he became] aware of a change in [Mrs. Shields'] circumstances which would likely justify the granting of a moratorium." 7 C.F.R. § 1951.313(b)(ii) (1986). The applicable moratorium regulations indicated that relief should be granted if a borrower's income is reduced so that housing costs rise to 35 percent or more of the household income. 7 C.F.R. § 1951.313(a)(2)(i) (1986).

These regulations required that the income reduction be caused in one of five listed ways indicating it was due to circumstances beyond the borrower's control.

Two of these are potentially applicable to Mrs. Shields' case:

(D) A situation in which a spouse is living apart from the borrower's family and away from the [FmHA] financed dwelling and legal action has been started in the appropriate court to commence divorce or legal separation proceedings provided: the remaining spouse is occupying the dwelling, owns a legal interest in the property, is liable for the debt, and the loan account is put in the remaining spouse's name only....

(E) A situation in which a spouse has lived apart from the borrower's family and away from the [FmHA] financed dwelling for 6 months or longer because of broken marriage or separation ... provided the conditions of paragraph (a)(2)(i) of this section are met by the borrower who is living in the dwelling.

7 C.F.R. § 1951.313(a)(2)(i) (1986).

On July 23, 1986, County Supervisor Button learned of the restraining order against Mr. Shields that was issued May 13, 1986. That order prevented Mr. Shields from continuing to reside in the Shields' FmHA-financed home. If this restraining order constituted appropriate legal action for the purposes of 7 C.F.R. § 1951.313(a)(2)(i)(D) (1986), then County Supervisor Button should have advised Mrs. Shields immediately of the possible availability of moratorium relief. At the very least, after the Shields were separated for six months (i.e., November 13, 1986), County Supervisor Button should have advised Mrs. Shields of the possible availability of moratorium relief pursuant to 7 C.F.R. § 1951.313(a)(2)(i)(E) (1986).

■ New FmHA regulations regarding moratorium relief became effective February 4, 1987. *See* 7 C.F.R. § 1951.313 (1989). These regulations included a new prerequisite that the FmHA loan not have been accelerated. 7 C.F.R. § 1951.313(b)(3) (1989). The United States points out, however, that the FmHA had a "policy" against granting post-acceleration moratorium relief prior to its promulgation as a formal criterion.

The United States argues that, due to its policy barring post-acceleration moratorium relief, the FmHA had no duty to advise Mrs. Shields about moratorium relief after the Shields' loan was accelerated, regardless of any change in her circumstances. However, even if the Secretary's promulgation of a formal regulation banning post-acceleration moratorium relief was a valid exercise of his authority, the FmHA's failure to notify Mrs. Shields of her right to apply for a moratorium *prior* to the effective date of that regulatory criterion was improper.

The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA"), defines and governs the rule-making duties of federal administrative agencies. Therefore, we must look to the APA in determining whether, at any particular time, the policies and regulations of the FmHA were proper.

The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. § 551(4). Clearly, a policy precluding moratorium relief pursuant to 42 U.S.C. § 1475 with regard to *any* loan that has been accelerated, regardless of any change in the borrower's circumstances, falls within the ambit of this definition and is properly considered a "rule."

■ Mrs. Shields takes issue with what she argues was an "unwritten policy" of the FmHA denying all applications for post-acceleration moratorium relief. At the time Mrs. Shields loan was accelerated, the Secretary had published proposed rules that explicitly acknowledged such an unwritten policy. 50 Fed.Reg. 38,662 (1985). This does not end the Court's inquiry, though. On its face, the APA exempts any "matter relating to ... public property, loans, grants, benefits, or contracts ..." from the operation of its rule-making requirements of notice and comment. 5 U.S.C. § 553(a)(2). Thus, FmHA loan programs facially do not need to comply with the APA's various notice and comment requirements to be effective.

The Administrative Conference of the United States has recommended the repeal of this exemption from notice and comment requirements. *See* 1 C.F.R. § 305.69–8 (1989). On July 24, 1971, the Secretary promulgated a regulation accepting this recommendation. *See* 36 Fed.Reg. 13804 (1971). This regulation requires the Secretary to comply with the APA's notice and comment requirements with regard to loan programs he administers. *Rodway v. United States Dep't of Agriculture,* 514 F.2d 809, 814 (D.C.Cir.1975); *Arlington Oil Mills, Inc. v. Knebel,* 543 F.2d 1092, 1095 n. 6 (5th Cir.1976). This regulation has the force of law. *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974).

The Secretary expressly chose to perform notice and comment rule-making regarding the preclusion of post-acceleration moratorium relief, as evidenced by his proposal and eventual enactment of 7 C.F.R. § 1951.313(b)(3) (1989). However, formal notice and comment rule-making is not required by the terms of the APA if this criterion is simply an "interpretative rule" or a "general statement of policy," and thus not a substantive rule. 5 U.S.C. § 553(b)(3)(A).

The Second Circuit has recognized that "[t]he distinctions between formal rules and interpretive rules or general statements of policy are often vague." *Grocery Mfrs. of America, Inc. v. Gerace,* 755 F.2d 993, 1002 (2d Cir.), *aff'd,* 474 U.S. 801, 106 S.Ct. 36, 88 L.Ed.2d 29, *cert. denied,* 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1985). *See also Noel v. Chapman,* 508 F.2d 1023, 1029–30 (2d Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975) (the distinction between rules and policies "is enshrouded in considerable smog ...."). Nonetheless, the Second Circuit has provided some guidance:

> While it is unfortunate that Congress has provided little guidance in distinguishing interpretative from substantive rules, the case law in this circuit looks to whether a rule "changed existing rights and obligations." ... Only rules that do not change "existing rights and obligations" are considered interpretative.

*Donovan v. Red Star Marine Services, Inc.,* 739 F.2d 774, 783 (2d Cir.), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1355, 84 L.Ed.2d 377 (1984) (quoting *Lewis–Mota v. Secretary of Labor,* 469 F.2d 478, 482 (2d Cir.1972)).

In *Donovan,* the court held that including *ex parte* warrants within the definition of "compulsory process," as used by the statute in question, was an interpretative rule since "compulsory process" included *ex parte* warrants regardless of any agency rule. In contrast, *Lewis–Mota* concluded that imposing new entrance requirements on aliens seeking admission into the United States required notice and comment rule-making. The court stated in *Lewis–Mota:*

> We find that the Directive changed existing rights and obligations by requiring aliens of the class of appellants to submit proof of specific job offers as well as a statement of their qualifications; it thereby made it more difficult for employers to fill vacancies in the occupations no longer precertified. By virtue of this substantial impact both upon the aliens and employers, notice and opportunity for comment by the public should first be provided.

469 F.2d at 482.

The case at bar is more similar to *Lewis–Mota* than *Donovan.* An FmHA policy precluding post-acceleration moratorium relief creates an additional hurdle for FmHA borrowers seeking such relief since it is conceivable that a borrower could make the requisite showings for relief absent such a prohibition. As was the case in *Lewis–Mota,* this additional requirement makes it "more difficult" for borrowers to receive moratorium relief, and subsequently has a "substantial impact" on the statutory moratorium remedy.

Therefore, the prohibition of post-acceleration moratorium relief is a substantive rule that must comply with the notice and comment requirements in 5 U.S.C. § 553. This conclusion is buttressed by the fact that the Secretary himself felt it prudent to perform notice and comment rule-making.

The resulting substantive rule, codified at 7 C.F.R. § 1951.313(b)(3) (1989) and effective February 4, 1987, was enacted in the only manner that the Secretary *could* have promulgated such a rule if it was within the scope of his statutory authority to do so. Therefore, any "policy" prior to February 4, 1987, that had not undergone the rigors of notice and comment rule-making was ineffective.

### B. *The Validity of Regulation Prohibiting Post–Acceleration Moratorium Relief*

■ The Act provides moratorium relief for borrowers who participate in FmHA loan programs. The operative statute reads in part:

> During any time that any such loan is outstanding, the Secretary is authorized under regulations to be prescribed by him to grant a moratorium upon the payment of interest and principal on such loan for so long a period as he deems necessary, upon a showing by the borrower that due to circumstances beyond his control, he is unable to continue making payments of such principal and interest when due without unduly impairing his standard of living.

42 U.S.C. § 1475.

On December 9, 1981, a number of regulations concerning FmHA loan programs became effective. *See* 46 Fed.Reg. 60,179 (1981). Less than four years later, on September 24, 1985, notice that the Secretary was proposing several new regulations was published in the Federal Register. *See* 50 Fed.Reg. 38,662 (1985). These new regulations did not become effective, however, until February 4, 1987. *See* 52 Fed.Reg. 243 (1987).

The 1981 regulations delineated certain circumstances that would establish that the borrower's income reduction had unduly impaired his or her standard of living. For instance, this requirement could be satisfied if the borrower demonstrated "[t]he need to pay certain essential family expenses which have resulted or may result in a lien being placed on the borrower's dwelling, and which if not paid are likely to result in a loss of the dwelling." § 1951.313(a)(2)(ii).

Alternatively, if a reduction in the borrower's income led to housing costs rising to 35 percent or more of that income, the above requirement would be satisfied. § 1951.313(a)(2)(i). However, one of the following circumstances needed to be the cause behind the borrower's income reduction:

(1) "Unemployment or underemployment caused by circumstances beyond the borrower's control...." § 1951.313(a)(2)(i)(A).

(2) "Loss or reduction in benefits which constituted a substantial part of the [borrower's] income...." § 1951.313(a)(2)(i)(B).

(3) "Illness, injury, or death of the borrower or other adult who contributed to the [borrower's] income...." § 1951.313(a)(2)(i)(C).

(4) "A situation in which a spouse is living apart from the borrower's family and away from the [FmHA] financed dwelling and legal action has been started in the appropriate court to commence divorce or legal separation proceedings provided: the remaining spouse is occupying the dwelling, owns a legal interest in the property, is liable for the debt, and the loan account is put in the remaining spouse's name only...." § 1951.313(a)(2)(i)(D).

(5) "A situation in which a spouse has lived apart from the borrower's family and away from the [FmHA] financed dwelling for 6 months or longer because of broken marriage or separation and not because of work assignment or military orders and legal papers have not been filed to commence divorce proceedings, provided the conditions of paragraph (a)(2)(i) of this section are met by the borrower who is living in the dwelling." § 1951.313(a)(2)(i)(E).

These substantive criteria for moratorium relief were clearly within the scope of the Secretary's authority. Specifically, the Secretary had prescribed regulations properly establishing when a borrower has shown, "due to circumstances beyond his

control, he is unable to continue making payments ... when due without unduly impairing his standard of living." 42 U.S.C. § 1475.

The 1985 proposed regulations, later enacted and codified at 7 C.F.R. § 1951.313 (1988), revamped the criteria for moratorium relief. Instead of the previous scheme, which tracked the Secretary's explicit statutory authority fairly closely, the new regulations delineated four requirements:

(1) "The borrower is temporarily unable ... to continue making scheduled payments without unduly impairing his or her standard of living." 7 C.F.R. § 1951.313(b)(1) (1989). This can be demonstrated in two ways: (a) the borrower's income has decreased by at least 30 percent, or (b) the borrower must pay certain unexpected and unreimbursed expenses.

(2) "The borrower must occupy the dwelling unless the dwelling is determined by FmHA to be uninhabitable." § 1951.313(b)(2).

(3) "The borrower's account has not been accelerated." § 1951.313(b)(3).

(4) "The borrower agrees to notify the County Supervisor if the circumstances on which the moratorium was based change and agrees to keep real estate taxes and hazard insurance premiums current during the moratorium period." § 1951.313(b)(4).

The new regulations direct that a moratorium will be granted, upon written request by the borrower, if the County Supervisor finds that the borrower is receiving all applicable interest credits and that he or she meets the above eligibility criteria. § 1951.313(c).

The dispute at bar concerns the new criterion barring moratorium relief for any and all FmHA loans that have been accelerated. The Secretary has stated that this new criterion simply "clarifies" prior FmHA policy regarding accelerated loans. See 52 Fed.Reg. 245 (1987). While there might be a question about the validity of unwritten, generally applicable eligibility criteria in light of the APA, that issue is not presented here—prior to acceleration of the Shields' FmHA loan, the policy was described in connection with the Secretary's proposed regulations in 1985.

At issue is whether the Secretary's blanket prohibition of post-acceleration moratorium relief is a valid exercise of his statutory authority. If, in the end, we find that the regulation lies beyond the scope of the Secretary's statutory authority, the regulation must give way to the statute since, in the words of Chief Justice Marshall, "that which is not supreme must yield to that which is supreme." Brown v. Maryland, 25 U.S. (12 Wheat.) 419, 448, 6 L.Ed. 678 (1827).

While making this inquiry, we are guided by Justice Felix Frankfurter's "threefold imperative" regarding statutory interpretation: "(1) Read the statute; (2) read the statute; (3) read the statute!" H. Friendly, Benchmarks (1967) 202. Since the Act's legislative history sheds little light on this precise issue, we have little choice but to follow Justice Frankfurter's advice.

A few issues can be resolved at the outset. First, the language "is authorized" does not grant the Secretary discretion over whether to grant moratorium relief to a qualifying borrower. If a borrower qualifies for a moratorium, the Secretary must grant one. 7 C.F.R. § 1951.313(c) (1988); United States v. Garner, 767 F.2d 104 (5th Cir.1985); Johnson v. United States Dep't of Agriculture, 734 F.2d 774 (11th Cir. 1984).

Second, the statute clearly requires that the Secretary prescribe regulations governing the availability of moratorium relief. See Ramey v. Block, 738 F.2d 756 (6th Cir.1984) (distinguishing the language of 7 U.S.C. § 1981a, which does not require regulations, from the language of 42 U.S.C. § 1475, which does not require regulations). The Secretary's prescription of extensive regulations regarding moratorium relief throughout the period in question satisfies this requirement.

Third, moratorium relief is available only to borrower's who satisfy substantive criteria demonstrating that, due to circumstances beyond his or her control, the borrower

is unable to make scheduled loan payments without unduly affecting his or her standard of living. While these statutory grounds for relief do not preclude further refinement by the Secretary's regulations, *Curry v. Block*, 738 F.2d 1556 (11th Cir. 1984), the statute nonetheless remains the polestar that must guide any regulatory scheme. The approaches taken by the 1981 and 1987 regulations may differ, but they both serve to clarify and interpret the meaning of the statutory grounds for relief.

The real dispute is over the meaning of the following language in 42 U.S.C. § 1475: "During any time that any such loan is outstanding...." Mrs. Shields contends that this language mandates the availability of moratorium relief from the loan's closing until full repayment or actual foreclosure occurs, provided the borrower satisfies the statutory grounds for relief. She further asserts that a blanket prohibition of post-acceleration moratorium relief ignores the statute's broad phrasing in favor of an arbitrary and invalid time restraint.

On the other hand, the United States contends that a criterion requiring that the loan not have been accelerated simply reflects the reality of a deteriorating borrower/lender relationship. The decision to accelerate an FmHA loan is not made until all servicing efforts have failed and it has been determined that further attempts to resolve the situation would be fruitless. *See* 52 Fed.Reg. 245 (1987). Therefore, precluding post-acceleration moratorium relief is consonant with the temporary nature of moratoria—the County Supervisor will grant a moratorium only when the borrower's inability to pay is "temporary." 7 C.F.R. § 1951.313(b)(1).

At the outset, we observe: "The interpretation put on the statute by the agency charged with administering it is entitled to deference, but the courts are the final authorities on issues of statutory construction." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981). *See also Ithaca College v. N.L.R.B.*, 623 F.2d 224 (2d Cir.), *cert.*

*denied*, 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980). A plain reading of 42 U.S.C. § 1475 leads us to conclude that the blanket prohibition of post-acceleration moratorium relief embodied in 7 C.F.R. § 1951.313(b)(3) is invalid. Such a prohibition is contrary to the statutory mandate that the Secretary grant moratorium relief to a borrower who, at any time his or her FmHA loan is outstanding, can satisfy the requisite substantive grounds for relief.

It is conceivable that, after an FmHA loan is accelerated, but while it is still outstanding, a borrower could demonstrate the ability either to repay the loan in full or to resume scheduled payments after being afforded the opportunity to get back on his or her feet by means of a temporary moratorium. The FmHA's own regulations expressly recognize the possibility of post-acceleration rehabilitation and permit borrowers to make offers to cure any delinquency after acceleration has occurred. The FmHA then has the power to cancel foreclosure proceedings and to reinstate the loan. 7 C.F.R. § 1955.15(d)(3) (1989). The Congressional policy behind providing moratorium relief applies with as much force in the post-acceleration context as it does before acceleration.

County Supervisor Button's own notes indicate that he advised Mrs. Shields on April 10, 1987, that the FmHA has the discretion to cancel foreclosure proceedings if the borrower demonstrates the ability to recontinue periodic and timely payments. She apparently expressed some desire to cure the $3,872 delinquency and continue the loan in her name alone. County Supervisor Button apparently was amenable to Mrs. Shields' offer.

There is some evidence that Mrs. Shields could have demonstrated the ability to cure the loan defaults if afforded temporary moratorium relief. However, that is not the issue before us. What is the issue is that she was never given the *opportunity* to make such a showing. Her application for moratorium relief was not denied because of any substantive criterion founded upon the statute's directives; instead, her application was denied because the Shields'

FmHA loan had been accelerated, regardless of any change in her circumstances.

To deny a moratorium application solely because the loan has been accelerated is contrary to the language in 42 U.S.C. § 1475 providing moratorium relief "[d]uring any time that any such loan is outstanding...." As one court ruled: "The fact of acceleration does not take this loan out from under the protection Congress obviously intended by the enactment [of 42 U.S.C. § 1475]." *United States v. Rodriguez*, 453 F.Supp. 21, 22 (E.D.Wash.1978). Moreover, any borrower must demonstrate that his or her inability to make scheduled payments is temporary in nature in order to receive moratorium relief. 7 C.F.R. § 1951.313(b)(1). Hence, such a post-acceleration prohibition is not necessary to prevent borrowers with a non-temporary inability to pay from receiving moratorium relief.

The above construction of 42 U.S.C. § 1475 is consistent with the broad legislative policies behind the Act. In enacting the Act, Congress declared:

> [T]he general welfare and security of the Nation and the health and living standards of its people require ... the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the nation.

42 U.S.C. § 1441. To facilitate these goals, Congress directed housing agencies to "exercise their powers, functions, or duties ... consistently with the national housing policy declared by this Act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established." *Id.* These legislative policies, and the FmHA's attendant duties, are to be construed broadly. *United States v. Gomiller*, 545 F.Supp. 17 (N.D.Miss.1981).

In light of these wide-ranging objectives, the expansive time-frame contemplated by the language of 42 U.S.C. § 1475, and the sufficient safeguards provided by the FmHA's substantive criteria, a blanket prohibition of all post-acceleration moratorium

relief goes beyond the Secretary's scope of statutory authority. Therefore, the regulation barring post-acceleration moratorium relief is invalid.

### C. *The Validity of The Supplemental Payment Agreement*

■ Congress has authorized the Secretary to issue rules and regulations governing review of certain FmHA actions and determinations. 42 U.S.C. § 1480(g). Specifically, Congress mandated adequate written notice to adversely affected borrowers and review by a body other than that which made the initial adverse decision. *Id.* The Secretary subsequently promulgated such regulations. *See* 7 C.F.R. § 1900.51 *et seq.*

The regulations in effect when the FmHA decided to accelerate the Shields' loan and commence foreclosure proceedings required written notice to the Shields of whatever appeal rights they possessed. 7 C.F.R. § 1900.53 (1986). These rights included a hearing before a body other than that which made the initial decision to accelerate.

Mrs. Shields does not allege that she or her husband did not receive adequate notice. They never appealed the FmHA's decision to accelerate, even though breach of the Supplemental Payment Agreement was one of the grounds for acceleration. Since they did not exhaust the administrative remedies available to them, judicial review of the basis for that decision is foreclosed.

It is a long-standing principle that a litigant's failure to exhaust available administrative remedies precludes judicial review of the agency action. *See, e.g., Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Litigants must avail themselves of administrative appeal procedures before access to the courts may be had. This principle is meant to preserve administrative autonomy and promote judicial efficiency. *McKart v. United States*, 395 U.S. 185, 194–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); *Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 574–75 (2d Cir.1979).

While Mrs. Shields frames this issue as an interpretive one similar to those regard-

ing post-acceleration moratorium relief, it is distinguishable for two primary reasons. First, no administrative appeal procedure was available to contest denial of post-acceleration moratorium relief. An elaborate appeal procedure was available at the acceleration stage. Second, the reasonableness or appropriateness of an otherwise binding Supplemental Payment Agreement involved the FmHA's expertise in loan affairs and its factual findings regarding Mr. Shields' ability to make supplemental payments.

The issue of whether Mr. Shields' oral representations, after having failed to complete Budget Forms in the past, satisfied the FmHA's servicing regulations could have been raised and should have been raised at the time the FmHA accelerated the Shields' loan. Before litigants may successfully seek judicial review, they must avail themselves of administrative appeal procedures when agency expertise and fact-finding are involved. *McGee v. United States*, 402 U.S. 479, 486, 91 S.Ct. 1565, 1569, 29 L.Ed.2d 47 (1971).

Therefore, we decline to rule on the appropriateness of Assistant County Supervisor Roderick's use of Mr. Shields' oral representations while drafting the Supplemental Payment Agreement since the Shields failed to avail themselves of the appropriate administrative remedies.

## CONCLUSION

In light of the foregoing, we grant Mrs. Shields' motion for summary judgment with regard to the two post-acceleration moratorium issues, and deny it with regard to the issue of the Supplemental Payment Agreement's validity. Summary judgment will be entered for the defendant as to the two post-acceleration moratorium issues and for the plaintiff on the issue of the Supplemental Payment Agreement's validity. This cause is remanded to the United States of America (FmHA) for reconsideration in light of this opinion.